**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN DOE 1, a minor, by and through his father and next friend, PARENT DOE 1;

JOHN DOE 2, a minor, by and through his legal guardian and next friend, PARENT DOE 2;

JANE DOE 3, a minor, by and through her legal guardian and next friend, PARENT DOE 2;

JOHN DOE 4, a minor, by and through his father and next friend, PARENT DOE 4;

JOHN DOE 5, a minor, by and through his parent and next friend, PARENT DOE 5;

JOHN DOE 6, a minor, by and through his parent and next friend, PARENT DOE 6;

JOHN DOE 7, a minor, by and through his parent and next friend, PARENT DOE 7;

JOHN DOE 8, a minor, by and through his parents and next friends, PARENT DOE 8 and PARENT DOE 8-B;

JOHN DOE 9, a minor, by and through his parents and next friends, PARENT DOE 8 and PARENT DOE 8-B;

JOHN DOE 10, a minor, by and through his parents and next friends, PARENT DOE 10 and PARENT DOE 10-B;

JOHN DOE 11, a minor, by and through his parents and next friends, PARENT DOE 11 and PARENT DOE 11-B;

Case No. ________________

Hon. ____________________

Mag. ____________________

**CLASS ACTION**

**JURY TRIAL DEMANDED**

JOHN DOE 12, a minor, by and through his parents and next friends, PARENT DOE 12 and PARENT DOE 12-B;

JANE DOE 13, a minor, by and through her parents and next friends, PARENT DOE 13 and PARENT DOE 13-B;

PARENT DOE 1; PARENT DOE 2; PARENT DOE 4; PARENT DOE 5; PARENT DOE 6; PARENT DOE 7; PARENT DOE 8; PARENT DOE 8-B; PARENT DOE 10; PARENT DOE 10-B; PARENT DOE 11; PARENT DOE 11-B; PARENT DOE 12; PARENT DOE 12-B; PARENT DOE 13; and PARENT DOE 13-B, each individually;

each individually and on behalf of all others similarly situated,

Plaintiffs,

v.

BRYAN SHANLEY SACK, M.D.;
NATIONWIDE CHILDREN'S HOSPITAL, an Ohio nonprofit corporation, d/b/a NATIONWIDE CHILDREN'S HOSPITAL – TOLEDO;
MERCY HEALTH – ST. VINCENT MEDICAL CENTER LLC;
DOE CORPORATIONS 1–10; and JOHN ROES 1–10,

Defendants.
_____________________________________/

STINAR LANNEN, PLLC

/s/ *Patrick Lannen*
Parker Stinar (P75252)
Patrick Lannen (P73031)
280 W. Maple Rd., Ste. 200
Birmingham, MI 48009
Patrick@StinarLannenLaw.com
Parker@StinarLannenLaw.com

FLOOD LAW, PLLC

/s/ *Michael D. Weaver*
Todd F. Flood (P58555)
Michael D. Weaver (P43985)
155 W. Congress St., Ste. 350
Detroit, MI 48226
tflood@floodlaw.com
mweaver@floodlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, thirteen minor children and their parents and legal guardians, individually and on behalf of all others similarly situated, by their attorneys, STINAR LANNEN, PLLC and FLOOD LAW, PLLC, state as follows for their Class Action Complaint and Jury Demand:

## INTRODUCTION

1. This case is about a pediatric urologist who spent his working days examining, photographing, and operating on the genitals of infants and children while he kept a cloud-storage account holding 1,291 files of child pornography and 27,864 files of "age difficult or child exploitative" material, and about the hospitals that gave him that access without the safeguards that would have protected those children.

2. Defendant Bryan Shanley Sack, M.D. ("Sack") was a pediatric urologist employed by Defendant Nationwide Children's Hospital and identified by

federal investigators as the Chief of Pediatric Urology at Nationwide Children's Hospital – Toledo. He practiced on the Mercy Health – St. Vincent Medical Center campus in Toledo, Ohio, where Nationwide Children's Hospital – Toledo operates, and, upon information and belief, at Nationwide Children's Hospital's main campus in Columbus, Ohio, and in Ann Arbor, Michigan.

3. According to the sworn affidavit of a Special Agent of the Federal Bureau of Investigation, Sack's Dropbox account contained not only child pornography but also "numerous images of surgical procedures, including images/videos of similar procedures/pediatric ailments, depicting close-up images of children's genitals." Criminal Complaint, *United States v. Sack*, No. 26-cr-20300 (E.D. Mich. May 12, 2026), ECF No. 1 ("Crim. Compl."), Aff. ¶ 14.

4. The same affidavit reports that, based on the agent's conversations with Sack's former employer, "it was a violation of the terms of Sack's hospital **employment** to have these images/videos on his personal electronic devices and/or cloud storage accounts such as his Dropbox account." *Id*. (emphasis in original).

5. One of the four IP addresses used to log into that Dropbox account geolocated to Toledo, Ohio, with an Internet Service Provider of "Catholic HealthCare Partners, Mercy Health," in the same geographic area as the hospital where Sack practiced. Crim. Compl., Aff. ¶¶ 8, 13, 20. Upon information and belief, that is the Mercy Health network serving the campus on which Sack practiced.

6. The Minor Plaintiffs are thirteen children whom Sack examined, photographed, and/or operated on, many of them infants and toddlers. Several were photographed by Sack, including with what their parents observed or believed was a cell phone. Several were taken away from their parents, alone with Sack, undressed or under anesthesia.

7. When Sack was arrested in February 2026, Nationwide Children's Hospital told the public that its "understanding from law enforcement is that the charges are not related to his clinical work including Nationwide Children's – Toledo," and reassured at least one Plaintiff family by telephone that no patients had been affected. Three months later, the FBI disclosed under oath that Sack's account held close-up images of children's genitals from pediatric surgical procedures.

8. Plaintiffs bring this action to hold Sack accountable under federal and state law, to hold the hospitals accountable for failing to supervise him, to chaperone his encounters with undressed and anesthetized children, and to enforce their own prohibition on clinical images leaving their systems, and to compel the identification, recovery, and destruction of every image of every child that Sack removed from the clinical setting.

## PARTIES

### A. Pseudonymous Plaintiffs

9. Every Minor Plaintiff is a child who was, at all relevant times, under the age of eighteen. Pursuant to Fed. R. Civ. P. 5.2(a), the Minor Plaintiffs are identified by pseudonym, and their parents and legal guardians are identified by corresponding pseudonyms to prevent identification of the children. Plaintiffs will file a motion for leave to proceed pseudonymously and for a protective order, and they will disclose their true identities to Defendants under seal or subject to that order.

10. The term "Minor Plaintiffs" refers to John Doe 1, John Doe 2, Jane Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, John Doe 12, and Jane Doe 13. The term "Parent Plaintiffs" refers to Parent Doe 1, Parent Doe 2, Parent Doe 4, Parent Doe 5, Parent Doe 6, Parent Doe 7, Parent Doe 8, Parent Doe 8-B, Parent Doe 10, Parent Doe 10-B, Parent Doe 11, Parent Doe 11-B, Parent Doe 12, Parent Doe 12-B, Parent Doe 13, and Parent Doe 13-B, each of whom sues individually and as next friend of his or her minor child or children. Minor Plaintiffs and Parent Plaintiffs are together "Plaintiffs."

## B. The Minor Plaintiffs and Parent Plaintiffs

**John Doe 1 (Ann Arbor, Michigan)**

11. John Doe 1 is a minor child, approximately three and one-half years of age, and a resident and citizen of the State of Michigan. He sues by and through his father and next friend, Parent Doe 1, a resident and citizen of the State of Michigan.

12. In approximately early 2024, when John Doe 1 was approximately nine months old, Sack performed surgery on John Doe 1's penis in Ann Arbor, Michigan to correct a condition affecting his ability to urinate. Upon information and belief, Sack held a clinical faculty appointment in urology at the University of Michigan at that time.

13. During that treatment John Doe 1 was undressed, exposed, and under anesthesia, and outside the presence of his parents. Whether Sack photographed or recorded John Doe 1 is presently known only to Sack and to law enforcement, which holds the contents of Sack's accounts and devices.

**John Doe 2 and Jane Doe 3 (Toledo, Ohio)**

14. John Doe 2 (born 2017) and Jane Doe 3 (born 2016) are siblings and residents and citizens of the State of Ohio. They sue by and through their legal guardian and next friend, Parent Doe 2, a resident and citizen of the State of Ohio.

15. John Doe 2 was seen by Sack on approximately three to four occasions between approximately May and September 2025 at the Mercy pediatric urology

clinic on Cherry Street in Toledo, Ohio, for evaluation and surgical repair of two hernias, which Sack performed.

16. During that care, John Doe 2 was taken out of the examination room by Sack, purportedly for imaging of his abdomen below the navel, without his guardian present and without any chaperone.

17. Approximately one month after his surgery, John Doe 2 exhibited a marked, uncharacteristic behavioral change involving privacy and physical boundaries with other children that his guardian had never before observed.

18. Jane Doe 3 was seen by Sack on approximately two occasions between approximately January and June 2025 at the same clinic for evaluation of two hernias. Parent Doe 2 recalls that Sack photographed Jane Doe 3's body in the area of her navel. Jane Doe 3's surgery was never completed, and Parent Doe 2 is now afraid to allow further procedures for her.

**John Doe 4 (Toledo, Ohio)**

19. John Doe 4 (born 2019) is a resident and citizen of the State of Ohio. He sues by and through his father and next friend, Parent Doe 4, a resident and citizen of the State of Ohio.

20. John Doe 4 was treated at Mercy Health – St. Vincent Medical Center / Nationwide Children's Hospital – Toledo on approximately six occasions for an undescended testicle, including treatment by Sack and surgery to bring down the

testicle. John Doe 4's family was told that his operation was subject to photographs and documentation.

21. In or about March 2026, after Sack's arrest became public, Nationwide Children's Hospital telephoned John Doe 4's mother and assured her that no patients had been affected.

**John Doe 5 (Toledo, Ohio)**

22. John Doe 5 (born 2025) is a resident and citizen of the State of Ohio. He sues by and through his parent and next friend, Parent Doe 5, a resident and citizen of the State of Ohio.

23. John Doe 5 was seen by Sack on two occasions in approximately September and October 2025 at Nationwide Children's Hospital – Toledo on the Mercy Health – St. Vincent Medical Center campus, where Sack examined the infant's penis to evaluate revision of a circumcision. Sack advised that the revision be deferred until John Doe 5 reached elementary-school age. Parent Doe 5 obtained a second opinion, transferred John Doe 5's care to another provider, and corrective surgery was scheduled.

**John Doe 6 (Toledo, Ohio)**

24. John Doe 6 (born 2025) is a resident and citizen of the State of Ohio. He sues by and through his parent and next friend, Parent Doe 6, a resident and citizen of the State of Ohio.

25. On or about September 24, 2025, Sack examined the infant John Doe 6's genitals for undescended testicles at the Mercy / St. Vincent pediatric urology clinic in Toledo, Ohio. During that genital examination Sack used his own cell phone, including its light, held over and directed at the infant's exposed genitals and, on information and belief, took photographs.

**John Doe 7 (Maumee, Ohio)**

26. John Doe 7 (born 2010) is a resident and citizen of the State of Ohio. He sues by and through his parent and next friend, Parent Doe 7, a resident and citizen of the State of Ohio.

27. Between approximately November 2024 and May 2025, Sack treated John Doe 7 on approximately five occasions at Nationwide Children's Hospital – Toledo for an undescended testicle, including pre-operative examination, surgery under anesthesia, and follow-up. On at least one occasion, John Doe 7 was alone with Sack during a genital examination, with no chaperone present. Parent Doe 7 has requested but, as of the filing of this Complaint, has not received the operative records for John Doe 7's surgery.

**John Doe 8 and John Doe 9 (Waterville, Ohio)**

28. John Doe 8 and John Doe 9 (both born 2025) are twin brothers and residents and citizens of the State of Ohio. They sue by and through their parents

and next friends, Parent Doe 8 and Parent Doe 8-B, residents and citizens of the State of Ohio.

29. Between approximately May 2025 and January 2026, Sack saw John Doe 8 on approximately five occasions at Nationwide Children's Hospital – Toledo for a congenital condition of the penis. On or about December 2, 2025, Sack performed surgery on John Doe 8 under general anesthesia. Afterward, Sack told Parent Doe 8 that only a circumcision had been needed, leaving the parents to question why the infant had been placed under general anesthesia and taken to the operating room at all.

30. Between approximately May and October 2025, Sack saw John Doe 9 on approximately three occasions at Nationwide Children's Hospital – Toledo for circumcision.

**John Doe 10 (Tiffin, Ohio)**

31. John Doe 10 (born 2025) is a resident and citizen of the State of Ohio. He sues by and through his parents and next friends, Parent Doe 10 and Parent Doe 10-B, residents and citizens of the State of Ohio.

32. Between approximately August 2025 (prenatally) and February 2026, Sack treated John Doe 10 on approximately five to six occasions at Mercy Health – St. Vincent Medical Center / Nationwide Children's Hospital – Toledo for a kidney

condition, including a catheter-based bladder imaging study performed when John Doe 10 was two to three days old and an outpatient circumcision.

**John Doe 11 (Delta, Ohio)**

33. John Doe 11 (born 2016) is a resident and citizen of the State of Ohio. He sues by and through his parents and next friends, Parent Doe 11 and Parent Doe 11-B, residents and citizens of the State of Ohio.

34. Between approximately September 2024 and December 2025, Sack treated John Doe 11 on approximately four occasions at Nationwide Children's Hospital – Toledo for a congenital urinary-tract condition and bladder-control problems. Upon information and belief, John Doe 11 was previously treated at the University of Michigan's C.S. Mott Children's Hospital in Ann Arbor, Michigan.

35. In approximately 2025, Sack photographed John Doe 11's penis, telling his parents the photographs were for medical reasons. Parent Doe 11 believes the photographs were taken with a cell phone.

36. At one visit, Sack asked the then-nine- or ten-year-old John Doe 11 whether he wanted Sack to accompany him into the restroom while he urinated into a specimen cup. John Doe 11's father intervened.

**John Doe 12 (Coldwater, Michigan)**

37. John Doe 12 (born 2018) is a resident and citizen of the State of Michigan. He sues by and through his parents and next friends, Parent Doe 12 and Parent Doe 12-B, residents and citizens of the State of Michigan.

38. Between approximately August and December 2025, Sack treated John Doe 12 on approximately four to five occasions at Nationwide Children's Hospital – Toledo for an obstruction of the ureter and resulting kidney injury, including surgery. Sack operated on John Doe 12 outside the presence of his parents.

**Jane Doe 13 (Columbus, Ohio)**

39. Jane Doe 13 (born 2025) is a resident and citizen of the State of Ohio. She sues by and through her parents and next friends, Parent Doe 13 and Parent Doe 13-B, residents and citizens of the State of Ohio.

40. On or about December 5, 2025, when Jane Doe 13 was approximately three weeks old, Sack examined her at Nationwide Children's Hospital in Columbus, Ohio, for a congenital condition affecting the development of her genitals. During that first visit, Sack photographed the infant's genitals with a cell phone.

**C. Defendants**

41. Defendant Bryan Shanley Sack, M.D. is a physician and pediatric urologist who resides in Ann Arbor, Washtenaw County, Michigan, and is a citizen of the State of Michigan. Crim. Compl., Aff. ¶¶ 11, 19–20.

42. Defendant Nationwide Children's Hospital ("Nationwide Children's") is, upon information and belief, an Ohio nonprofit corporation with its principal place of business in Columbus, Ohio, and a citizen of the State of Ohio. Nationwide Children's owns and operates Nationwide Children's Hospital – Toledo and its main campus in Columbus, Ohio.

43. On March 1, 2022, Nationwide Children's assumed ownership of the former Mercy Health – Children's Hospital and began operating it as Nationwide Children's Hospital – Toledo inside the Mercy Health – St. Vincent Medical Center campus at 2213 Cherry Street, Toledo, Ohio, in space it leases from Mercy Health. Nationwide Children's publicly described the Toledo program's mission as serving children and families in "northwest Ohio and southeast Michigan."

44. Defendant Mercy Health – St. Vincent Medical Center LLC ("Mercy St. Vincent") is, upon information and belief, an Ohio limited liability company that owns and operates Mercy Health – St. Vincent Medical Center in Toledo, Ohio, and is part of Mercy Health – Toledo, a subsidiary of Bon Secours Mercy Health. Upon information and belief, none of Mercy St. Vincent's members is a citizen of Michigan.

45. Upon information and belief, Mercy St. Vincent owns and controls the campus, facilities, and computer network on which Nationwide Children's Hospital – Toledo operates; operates or operated the Mercy pediatric urology clinic on Cherry

Street at which Sack saw patients, including John Doe 2, Jane Doe 3, and John Doe 6; provides financial, logistical, and operational support to the Nationwide Children's Hospital – Toledo program; and furnished the "Catholic HealthCare Partners, Mercy Health" network from which Sack's Dropbox account was accessed.

46. Nationwide Children's and Mercy St. Vincent are together the "Hospital Defendants."

47. Doe Corporations 1–10 are entities whose identities are not yet known, including any professional corporation, physician practice, medical-staff organization, university, or management entity that employed, credentialed, contracted with, or was responsible for supervising Sack, or that was responsible for the safety and privacy of his patients or for the security of clinical images. Plaintiffs will amend to name them when they are identified.

48. John Roes 1–10 are individuals whose identities are not yet known who were responsible for supervising Sack, chaperoning his encounters with patients, securing clinical images, or receiving and acting on complaints about him, or who acted in concert with him. Plaintiffs will amend to name them when they are identified.

49. At all relevant times, Sack was an employee and/or actual, apparent, or ostensible agent of the Hospital Defendants. The Hospital Defendants held Sack out to the public, and to Plaintiffs, as their physician; Plaintiffs looked to the hospitals,

not to Sack individually, for care; and Plaintiffs had no notice that Sack was anything other than the hospitals' own physician.

## JURISDICTION AND VENUE

50. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Counts I and II arise under 18 U.S.C. § 2255 and 18 U.S.C. § 2252A(f).

51. This Court independently has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (a) the proposed classes each exceed 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed classes is a citizen of a State different from at least one Defendant. Ohio-citizen Plaintiffs are diverse from Sack, a Michigan citizen, and Michigan-citizen Plaintiffs John Doe 1, Parent Doe 1, John Doe 12, Parent Doe 12, and Parent Doe 12-B are diverse from the Hospital Defendants, which are Ohio citizens.

52. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claims.

53. This Court has personal jurisdiction over Sack, who is domiciled in Michigan. Service of process for the claim under 18 U.S.C. § 2255 may be made in any district in which Sack is an inhabitant or may be found. 18 U.S.C. § 2255(c)(2).

54. This Court has personal jurisdiction over the Hospital Defendants because it has both general and specific jurisdiction over them.

55. As detailed throughout this Complaint, the Hospital Defendants have long-standing continuous and systematics contacts with Michigan and are subject to general jurisdiction.

56. In addition, Michigan's long-arm statute reaches a foreign corporation that transacts any business within the State, or that does or causes any act to be done, or consequences to occur, in the State resulting in an action for tort. Mich. Comp. Laws § 600.715(1)–(2). Exercising jurisdiction here also comports with due process: each Hospital Defendant purposefully availed itself of the privilege of conducting activities in Michigan, and Plaintiffs' claims arise out of or relate to those contacts.

57. Nationwide Children's has deliberately defined the market for its Toledo program to include southeast Michigan, and has said so repeatedly in its own public statements:

a. In announcing the January 2020 affiliation that preceded the acquisition, Nationwide Children's described its purpose as "to enhance pediatric health care services for children and their families in northwest Ohio and southeast Michigan." Nationwide Children's Hosp., Nationwide Children's Hospital – Toledo News.[1]

b. In announcing the acquisition on December 3, 2020, Nationwide Children's chief operating officer, Rick Miller, stated that

[1] https://www.nationwidechildrens.org/newsroom/news-releases/toledo-news. (last visited on November 3, 2026).

Nationwide Children's and Mercy Health – Children's Hospital "share a mission to advance pediatric health care services for children and their families in northwest Ohio and southeast Michigan." Nationwide Children's Hosp., News Release, *Nationwide Children's Hospital to Acquire Mercy Health – Children's Hospital* (Dec. 3, 2020).[2]

c. In announcing the closing on March 1, 2022, Nationwide Children's stated that the two hospitals had "advanced subspecialty pediatric physician recruitment, enhanced continuing medical education and improved care coordination for families in northwest Ohio and southeast Michigan," and Mr. Miller stated that Nationwide Children's was "excited for this next step in advancing pediatric health services for families in northwest Ohio and southeast Michigan." Nationwide Children's Hosp., News Release, Nationwide Children's Hospital Formally Assumes Ownership of Mercy Health – Children's Hospital (Mar. 1, 2022).[3]

d. As of the filing of this Complaint, Nationwide Children's Toledo FAQ page continues to state that the hospitals "work closely to advance subspecialty pediatric physician recruitment, enhance continuing medical education and improve care coordination for families in northwest Ohio and southeast Michigan." Nationwide Children's Hosp., Nationwide Children's Hospital – Toledo FAQs.[4]

58. Nationwide Children's acquired an established regional pediatric hospital whose predecessor operator and current landlord, Mercy Health – Toledo, "serves 20 counties in Northwest Ohio and Southeast Michigan," as Nationwide

---

[2] https://www.nationwidechildrens.org/newsroom/news-releases/2020/12/mercy-health ("2020 Acquisition Release"). (last visited on November 3, 2026).

[3] https://www.nationwidechildrens.org/newsroom/news-releases/2022/03/toledo-announcement. (last visited on November 3, 2026).

[4] https://www.nationwidechildrens.org/locations/toledo/faqs. (last visited on November 3, 2026).

Children's itself recited in announcing the transaction. 2020 Acquisition Release, supra. Upon information and belief, the southeast Michigan patient and referral base of Mercy Health – Children's Hospital was a material part of what Nationwide Children's acquired and has continued to serve.

59. Nationwide Children's delivers pediatric services physically inside Michigan. Effective January 1, 2023, Nationwide Children's Hospital – Toledo assumed Mercy Health's athletic training and sports medicine program, which at the time comprised more than forty employees and "serve[d] more than 30 local schools and community programs across northwest Ohio and southeast Michigan." Mercy Health, News Release, Nationwide Children's Hospital – Toledo Formally Assumes Mercy Health's Athletic Training Program (Jan. 2023).[5] Upon information and belief, Nationwide Children's athletic trainers have provided sports-medicine services at Michigan schools and youth programs, and those programs refer Michigan children to Nationwide Children's Hospital – Toledo for specialty care.

60. Nationwide Children's maintains a clinical relationship with University of Michigan Health, a Michigan health system. University of Michigan Health lists Nationwide Children's Hospital – Toledo, at 2222 Cherry Street, as one of its own locations and states that "University of Michigan Health providers offer specialty

[5] https://www.mercy.com/news-events/news/toledo/2023/january/nationwide-childrens-hospital-toledo-formally-assumes-mercy-healths-athletic-training-program. (last visited on November 3, 2026).

care and services at Nationwide Children's Hospital in Toledo, Ohio." Univ. of Mich. Health, Nationwide Children's Hospital Toledo.[6] Upon information and belief, that relationship includes referral and care-coordination pathways through which Michigan children, including children previously treated at the University of Michigan's C.S. Mott Children's Hospital such as John Doe 11, are directed to Nationwide Children's Hospital – Toledo.

61. Consistent with its stated program of "subspecialty pediatric physician recruitment" for "families in northwest Ohio and southeast Michigan," Nationwide Children's recruited, credentialed, and installed as Chief of Pediatric Urology in Toledo a physician domiciled in Ann Arbor, Michigan, Crim. Compl., Aff. ¶¶ 19–20, who, upon information and belief, also practiced pediatric urology in Ann Arbor and held a clinical faculty appointment in urology at the University of Michigan. Upon information and belief, Nationwide Children's knew that Sack lived and practiced in Michigan and, by its own choice, granted him remote access to its electronic medical record, clinical-imaging, and communications systems from Michigan, so that he performed work-related functions for Nationwide Children's from Michigan, including accessing clinical images of its patients from devices and accounts he used at his Ann Arbor residence. Crim. Compl., Aff. ¶¶ 8, 14, 19.

---

[6] https://www.uofmhealth.org/locations-list/nationwide-childrens-hospital-toledo. (last visited on November 3, 2026).

62. Nationwide Children's regularly treats Michigan children and transacts business with Michigan families, physicians, and payers. John Doe 12, a Coldwater, Michigan resident, was treated by Sack at Nationwide Children's Hospital – Toledo on approximately four to five occasions, including surgery. Upon information and belief, the proposed classes include substantial numbers of Michigan children; and Nationwide Children's schedules appointments with, sends records and results to, and bills Michigan families, communicates with referring Michigan physicians, and participates in and is paid by Michigan-based commercial insurers and Michigan Medicaid managed-care plans for the care of Michigan children.

63. Upon information and belief, Nationwide Children's also markets its Toledo services, including its pediatric urology and surgical subspecialty services, to southeast Michigan families and physicians, including through digital and social-media advertising geo-targeted to Michigan audiences, physician-outreach and referral-development activity directed to Michigan pediatricians and family physicians, and web content directed to families in Monroe, Lenawee, Hillsdale, Branch, and Washtenaw Counties, Michigan.

64. Mercy St. Vincent likewise purposefully avails itself of the Michigan market. Mercy Health – Toledo, of which Mercy St. Vincent is part, holds itself out as serving twenty counties in northwest Ohio and southeast Michigan. 2020 Acquisition Release, supra. Upon information and belief, Mercy St. Vincent: (a)

treats Michigan patients, including children, on the campus on which Nationwide Children's Hospital – Toledo operates; (b) operated, before January 2023, the athletic training program that served schools and community programs in southeast Michigan; (c) accepts Michigan-transported patients through Mercy Health – Toledo's Life Flight critical air transport service; and (d) operated the Mercy pediatric urology clinic at which Sack saw patients, and furnished the "Catholic HealthCare Partners, Mercy Health" network from which Sack's Michigan-based Dropbox account was accessed. Crim. Compl., Aff. ¶¶ 8, 13.

65. Under *Ford Motor Co. v. Montana Eighth Judicial District Court*, specific jurisdiction requires that the plaintiff's claims "arise out of or relate to" the defendant's forum contacts; the "relate to" prong does not require strict but-for causation. 592 U.S. 351, 361-62 (2021). When a defendant systematically serves a market in the forum for the very product or service at issue, and that product or service injures a forum resident in the forum, the forum's courts may entertain the resulting suit. Plaintiffs' claims arise out of or relate to the Hospital Defendants' Michigan contacts in each of the following respects:

a. *The Hospital Defendants served the Michigan market for the very care at issue.* Nationwide Children's cultivated southeast Michigan as a market for subspecialty pediatric care, recruited subspecialists to serve "families in northwest Ohio and southeast Michigan," advertised that care to Michigan families and physicians, and delivered that care to Michigan children. Michigan Plaintiffs John Doe 12, Parent Doe 12, and Parent Doe 12-B are residents of that market who, upon information and

belief, were referred to or found the Hospital Defendants through those Michigan-directed activities, obtained from the Hospital Defendants the very pediatric urology care the Hospital Defendants offered to that market, and suffer their injuries in Michigan. This is the paradigm *Ford* addressed: a defendant that serves a forum market for a service, and a forum resident injured by that service.

b. *The Hospital Defendants chose a Michigan-based physician and equipped him to work from Michigan.* The physician whose conduct gives rise to every claim was the Hospital Defendants' own Chief of Pediatric Urology, recruited as part of their regional subspecialty recruitment. The Hospital Defendants made the deliberate choices to hire a Michigan-domiciled physician who continued to practice in Michigan, and, upon information and belief, to grant him remote access to their clinical systems from Michigan. Those choices are the Hospital Defendants' own contacts with Michigan, not merely the unilateral acts of a third party.

c. *The children's images were carried into and kept in Michigan.* The core wrong alleged against the Hospital Defendants is their failure to prevent, detect, and stop the removal of clinical images of children from their systems, in violation of the hospital-employment terms described by Sack's former employer, Crim. Compl., Aff. ¶ 14, and, upon information and belief, of the Hospital Defendants' own policies. Those images were possessed, stored, and accessed in Michigan: three of the four IP addresses used to access Sack's Dropbox account were assigned to his Ann Arbor residence. Crim. Compl., Aff. ¶¶ 8, 13–14, 19. The Hospital Defendants' acts and omissions, including their grant of remote system access to a physician they knew worked from Michigan, thus caused consequences to occur in Michigan resulting in actions for tort, Mich. Comp. Laws § 600.715(2). Because Fed. R. Civ. P. 23 class actions are not subject to *Bristol-Myers Squibb*'s claim-by-claim limitation as to absent class members, *Lyngaas v. Curaden AG*, 992 F.3d 412 (6th Cir. 2021), that Michigan nexus supports jurisdiction over the class claims regardless of the State in which a given absent class member was treated.

d. *The Hospital Defendants' network was used to reach the Michigan account.* The remaining IP address used to access the same account resolved to the "Catholic HealthCare Partners, Mercy Health" network, which, upon information and belief, serves the campus on which the Hospital Defendants operate. Crim. Compl., Aff. ¶¶ 8, 13. Upon information and belief, the Hospital Defendants' systems were thus used to reach the account Sack maintained and accessed from Michigan, and in which images of children were found.

e. *The post-arrest misrepresentations were directed into Michigan.* Nationwide Children's public statement that the charges were "not related to his clinical work," and its reassurances to Plaintiff families, addressed Sack's Michigan arrest, his Michigan charges, and the contents of his Michigan-based accounts. Upon information and belief, they were disseminated to, and relied on by, Michigan patient families within the market Nationwide Children's serves.

f. *The relief sought is centered in Michigan.* The identification, recovery, and destruction of the children's images that Plaintiffs seek require action directed at devices, accounts, and evidence located in, or seized in, this District. The related criminal prosecution is pending here, and the United States seeks forfeiture here of every visual depiction involved in the charged offenses and all property used to commit them. Indictment, ECF No. 15, at 2–3.

66. Exercising jurisdiction over the Hospital Defendants is reasonable. Michigan has a strong interest in protecting children from sexual exploitation and in redressing harms caused within its borders and to its residents; Plaintiffs have a strong interest in litigating in the District where the perpetrator resides, the images were kept, and the criminal case is pending; and the Hospital Defendants, which hold themselves out as serving southeast Michigan and operate within a short drive of this District, face no meaningful burden in defending here. The facts bearing on the

Hospital Defendants' Michigan marketing, referral relationships, Michigan patient volume, and remote-access arrangements are peculiarly within their control. Should any Hospital Defendant contest jurisdiction, Plaintiffs will seek jurisdictional discovery and, in the alternative, transfer rather than dismissal.

67. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) and 18 U.S.C. § 2255(c)(1) because Sack resides in this District; John Doe 1's surgery was performed in Ann Arbor, Michigan; and a substantial part of the events giving rise to the claims occurred here, including Sack's possession of child pornography and of patients' clinical images, and his access to his Dropbox account, from his Ann Arbor residence. Crim. Compl., Aff. ¶¶ 8, 11, 19–20. The related criminal prosecution is pending in this District.

## GENERAL ALLEGATIONS

### A. Sack's Access to Children

68. Sack's appointment at Nationwide Children's dates to April 26, 2024. Nationwide Children's has stated that he was employed at Nationwide Children's Hospital – Toledo for approximately eighteen months. In December 2025, he was employed as the Chief of Pediatric Urology at Nationwide Children's Hospital in Toledo, Ohio. Crim. Compl., Aff. ¶ 20. Upon information and belief, Sack was also a member of Nationwide Children's physician team for differences of sexual development, and he saw patients at its Columbus campus.

69. As a pediatric urologist, Sack's practice consisted of examining, imaging, and operating on the genitals and urinary tracts of children. His patients were routinely undressed, sedated, or under general anesthesia, and many were infants and toddlers too young to speak.

70. Parents and guardians entrusted their children to Sack and to the Hospital Defendants on the reasonable expectation that their children's bodies would be viewed, touched, and imaged only as legitimately required for treatment, in the presence of an appropriate chaperone, and that any clinical image would be taken on hospital-controlled equipment, kept in the medical record, and never removed from the hospitals' systems.

71. The risk that a physician with unsupervised access to children's genitals will exploit that access, and the risk that clinical photographs of children's genitals will be taken or kept on personal devices, are well known in the medical profession and to hospital administrators. Standard safeguards against those risks include chaperone requirements for sensitive examinations; prohibitions on personal devices for clinical photography; secure, hospital-controlled image-capture systems; data-loss-prevention and network monitoring; and prompt investigation of complaints.

**B. The Federal Investigation**

72. On December 1, 2025, Dropbox Inc. reported CyberTip #224629991 to the National Center for Missing and Exploited Children ("NCMEC"), listing the

email address bryan.sack@gmail.com and the username Bryan Sack. Four additional CyberTips (Nos. 224630966, 224626538, 224629692, and 224628179) were reported by Dropbox for the same account. Crim. Compl., Aff. ¶¶ 5–6.

73. On January 13, 2026, a detective with the Ann Arbor Police Department received the CyberTip from NCMEC, and the investigation that followed produced state and federal search warrants for Sack's Google, Dropbox, and AT&T accounts. Crim. Compl., Aff. ¶¶ 5, 9, 12, 19.

74. Dropbox uploaded more than forty image files to NCMEC, which the FBI confirmed depict child pornography, including images of prepubescent girls approximately nine to twelve years old bearing watermarks of the "LS-Models" and "magic-lolita.com" series. Crim. Compl., Aff. ¶ 7.

75. Three of the four IP addresses used to log into the account geolocated to Ann Arbor, Michigan and were leased by AT&T to Sack at his residence. The fourth geolocated to Toledo, Ohio, with an Internet Service Provider of "Catholic HealthCare Partners, Mercy Health." Crim. Compl., Aff. ¶¶ 8, 13, 19.

76. On December 1, 2025, the same day the CyberTips were generated, Sack emailed Dropbox support claiming his account had been "hacked" and that there had been "a lot of erroneous activity on it." Dropbox replied that the account had been deactivated for violating Dropbox's terms of service. Crim. Compl., Aff. ¶ 11.

77. Investigators also determined that Sack owned a MEGA cloud-storage account, a service that, in the FBI agent's training and experience, is commonly used to store child pornography. Crim. Compl., Aff. ¶ 10.

78. The Dropbox account contained more than 850 gigabytes of data in fourteen zip files. Crim. Compl., Aff. ¶ 12.

79. Among those files were "numerous images of surgical procedures, including images/videos of similar procedures/pediatric ailments, depicting close-up images of children's genitals." Crim. Compl., Aff. ¶ 14.

80. Sack's former employer told the FBI that keeping those images and videos on personal devices or cloud accounts violated the terms of Sack's hospital employment. Crim. Compl., Aff. ¶ 14.

81. The account also held a large quantity of images of nude minor girls, approximately eight to eighteen years old, posed erotically, many with their genitals as the focus of the camera; 1,291 files meeting the federal definition of child pornography; and 27,864 files that are "age difficult or child exploitative." Crim. Compl., Aff. ¶¶ 15–16.

82. A sub-folder labeled "other" held thirty-two hidden folders associated with the LS Magazine series of Eastern European child pornography, with titles including "ls-little virgins," "ls-little models," "ls-last virgins," and "ls-magic lolita." Crim. Compl., Aff. ¶¶ 17–18.

**C. Sack's Arrest, Termination, and Prosecution**

83. Upon information and belief, Sack was arrested by the Michigan State Police and, on or about February 21, 2026, arraigned in Michigan state court on six felony counts, including aggravated possession of child sexually abusive material and using a computer to commit a crime.

84. Nationwide Children's terminated Sack's employment on or about February 25, 2026. It publicly stated that its "understanding from law enforcement is that the charges are not related to his clinical work including Nationwide Children's – Toledo."

85. Nationwide Children's did not notify Sack's patients or their families that it had prohibited, and that Sack had nonetheless maintained, clinical images of children outside its systems, and it affirmatively reassured at least one Plaintiff family that no patients had been affected.

86. On May 12, 2026, a federal criminal complaint was filed in this District charging Sack with receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2)(A) and possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). Crim. Compl., ECF No. 1.

87. On May 15, 2026, Sack was arrested on the federal warrant, made his initial appearance, and was released on a $10,000 unsecured bond. On May 20, 2026, a grand jury returned a two-count indictment. Count One charges that, between on

or about April 1, 2025, and February 20, 2026, "in the Eastern District of Michigan, Southern Division, and elsewhere," Sack knowingly received child pornography using a means and facility of interstate and foreign commerce, in violation of 18 U.S.C. § 2252A(a)(2). Count Two charges that, during the same period, he knowingly possessed child pornography involving "a prepubescent minor and a minor who had not attained 12 years of age," in violation of 18 U.S.C. § 2252A(a)(5)(B). The indictment also seeks forfeiture under 18 U.S.C. § 2253 of every visual depiction involved in the offenses and all property used to commit them. Indictment, *United States v. Sack*, No. 2:26-cr-20300-LVP-DRG (E.D. Mich. May 20, 2026), ECF No. 15. On June 5, 2026, Sack was arraigned and pleaded not guilty. *Id.*, ECF Nos. 11, 14. Trial is currently set for January 12, 2027. *Id.*, ECF No. 21.

88. The charged offense period, April 1, 2025 through February 20, 2026, falls entirely within Sack's employment as a pediatric urologist, and Chief of Pediatric Urology, at Nationwide Children's Hospital – Toledo. It ended only days before Nationwide Children's terminated him on or about February 25, 2026. It overlaps the treatment of John Doe 2, Jane Doe 3, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, John Doe 12, and Jane Doe 13, and, upon information and belief, of John Doe 4. The grand jury charged that Sack received child pornography in this District "and elsewhere." That charge is consistent with the FBI's finding that one of the four IP addresses used to access

the account resolved to the "Catholic HealthCare Partners, Mercy Health" network in Toledo, Ohio. Crim. Compl., Aff. ¶¶ 8, 13. Sack was thus engaged in the charged offenses during the same months he was examining, photographing, and operating on the Minor Plaintiffs on the Hospital Defendants' premises.

### D. The Hospital Defendants' Failures

89. The Hospital Defendants had the ability and the duty to control the circumstances of Sack's encounters with children, including whether a chaperone was present, whether children were separated from their parents, whether personal devices were used in examination and operating rooms, and how clinical images were captured, stored, and transmitted.

90. Upon information and belief, the Hospital Defendants permitted Sack to examine undressed children and to take children away from their parents without a chaperone (as with John Doe 2 and John Doe 7); to use a personal cell phone during genital examinations (as with John Doe 6) and to photograph children's genitals with a cell phone (as with John Doe 11 and Jane Doe 13); and to propose accompanying a child into a restroom while the child urinated (as with John Doe 11).

91. Upon information and belief, the Hospital Defendants failed to detect that clinical images and videos of children's genitals were being removed from their systems to Sack's personal devices and cloud accounts, in violation of the hospital-employment terms described by Sack's former employer and, upon information and

belief, of the Hospital Defendants' own policies, and failed to detect that Sack accessed his Dropbox account from a hospital-campus network.

92. Upon information and belief, the Hospital Defendants received, or should have received, complaints and observations from patients, families, nurses, and staff about Sack's use of personal devices, his insistence on being alone with children, and his boundary-crossing conduct, and failed to investigate or act on them.

93. Had the Hospital Defendants enforced chaperone requirements, prohibited personal devices in sensitive examinations and procedures, secured clinical imaging, monitored their networks, and acted on warning signs, Sack would not have had the unsupervised, undocumented access to children that the conduct alleged in this Complaint required.

**E. Sack's Exploitation of the Minor Plaintiffs**

94. Upon information and belief, Sack photographed and/or recorded the Minor Plaintiffs' genitals, and/or the genitals of other patients, outside any legitimate medical purpose; removed those images from the clinical record to his personal devices and cloud accounts; and stored them together with a collection of child pornography and child-exploitative material, where they were exposed to third-party service providers and, upon information and belief, to others.

95. Plaintiffs' belief rests on the facts alleged above, including: the FBI's finding of close-up images of children's genitals from pediatric surgical procedures

in the same account as Sack's child pornography; Sack's photography of Minor Plaintiffs' genitals with a cell phone; his use of a personal phone during a genital examination; his practice of separating children from their parents; and his conduct toward John Doe 11. The specific images in Sack's accounts and devices are in the exclusive possession of Sack and of law enforcement, and Plaintiffs will likely have further evidentiary support after a reasonable opportunity for discovery. Fed. R. Civ. P. 11(b)(3).

96. Any examination, photograph, or recording of a child's genitals made, kept, or used for Sack's sexual interest or any purpose other than legitimate treatment involved no medical judgment and was not part of any medical care.

**F. Plaintiffs' Injuries**

97. Each Minor Plaintiff has suffered, and will continue to suffer, injuries including emotional distress, humiliation, fear, anxiety, and loss of dignity; the permanent violation of the privacy of his or her body; the ongoing risk that images of his or her body exist, have been shared, or will be shared; and the need for counseling, therapy, and monitoring now and in the future. Several Minor Plaintiffs are too young to understand what was done to them and will confront it as they grow up.

98. Each Parent Plaintiff has suffered, and will continue to suffer, severe emotional distress, guilt, and fear for his or her child; the loss of trust in medical

providers, including avoidance or delay of needed care for his or her children; and economic losses, including expenses for medical, psychological, and counseling care for his or her children.

**G. Timeliness**

99. Plaintiffs did not know, and had no reason to know, of Sack's conduct or of its connection to their own care until, at the earliest, the public reporting of Sack's arrest in February 2026, and as to the existence of clinical images of children's genitals in Sack's accounts, until the federal criminal complaint was filed on May 12, 2026.

100. The Hospital Defendants' public statement that the charges were unrelated to Sack's clinical work, and their reassurance that no patients had been affected, fraudulently concealed the existence of Plaintiffs' claims and the identity of those liable for them. Any applicable limitations period is therefore extended under Mich. Comp. Laws § 600.5855 and, in the alternative, tolled under the law of any other State that applies.

101. Each Minor Plaintiff remains a minor, and his or her claims are preserved during minority under Mich. Comp. Laws § 600.5851 and, in the alternative, the comparable law of any other State that applies. There is no time limit for an action under 18 U.S.C. § 2255. 18 U.S.C. § 2255(b).

## CLASS ACTION ALLEGATIONS

102. Plaintiffs bring this action individually and as a class action under Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and, as to particular issues, 23(c)(4), on behalf of the following classes and subclasses (together, the "Classes"):

a. **Notice and Remediation Class (Rule 23(b)(2)):** All persons who, while minors, were examined, treated, imaged, or operated on by Sack (i) at any facility owned, operated, or leased by either Hospital Defendant, or (ii) in the State of Michigan.

b. **Depicted Patient Class (Rule 23(b)(3)):** All members of the Notice and Remediation Class whose bodies appear in any photograph, video, or other visual depiction found in any account, device, or storage medium possessed, controlled, or used by Sack, as identified by law enforcement, by forensic review, or in discovery.

c. **Nationwide Children's Subclass:** All members of the Notice and Remediation Class who were examined, treated, imaged, or operated on by Sack at any facility owned or operated by Nationwide Children's, including Nationwide Children's Hospital – Toledo and Nationwide Children's Hospital in Columbus, Ohio.

d. **Mercy St. Vincent Subclass:** All members of the Notice and Remediation Class who were examined, treated, imaged, or operated on by Sack at Mercy Health – St. Vincent Medical Center or any clinic, facility, or campus it owned, operated, or controlled, including the Mercy pediatric urology clinic on Cherry Street in Toledo, Ohio.

e. **Michigan Subclass:** All members of the Notice and Remediation Class who were residents of Michigan when Sack treated them or who were treated by Sack in Michigan.

f. **Parent Class:** All parents and legal guardians of members of the Notice and Remediation Class, as to injunctive and notice relief, and of members of the Depicted Patient Class, as to damages.

103. Excluded from the Classes are Defendants; their officers, directors, and employees; and the judicial officers assigned to this action and their immediate families. Plaintiffs reserve the right to amend the class definitions as discovery proceeds, including by proposing additional subclasses by facility, time period, or governing law.

104. Numerosity. The exact number of class members is known to the Hospital Defendants from their medical, scheduling, and billing records and is presently unknown to Plaintiffs. Sack served as a pediatric urologist, and as Chief of Pediatric Urology, at Nationwide Children's Hospital – Toledo for approximately eighteen months, and also saw patients at the Mercy pediatric urology clinic and the Columbus campus. Upon information and belief, given the volume of a full-time pediatric urology practice over that period, the Notice and Remediation Class numbers between 1,000 and 2,500 members. The FBI found "numerous" images and videos of pediatric genital procedures within more than 850 gigabytes of data in Sack's account. Crim. Compl., Aff. ¶¶ 12, 14. Upon information and belief, the Depicted Patient Class and each subclass are therefore also so numerous that joinder is impracticable.

105. Ascertainability. Class members can be identified from the Hospital Defendants' electronic medical records, which identify every patient Sack saw and every procedure he performed.

106. Commonality and predominance. Questions of law and fact common to the Classes predominate over individual questions, including:

a. Whether Sack photographed, recorded, removed, or stored images of patients outside the clinical record, and which patients appear in the images recovered from his accounts and devices;

b. Whether the Hospital Defendants had, enforced, or ignored policies on chaperones, personal devices, clinical photography, and image security;

c. What the Hospital Defendants knew or should have known about Sack's conduct, and when;

d. Whether the Hospital Defendants monitored their networks and clinical-imaging systems and could have detected the removal of clinical images;

e. Whether the Hospital Defendants' public statements and patient reassurances after Sack's arrest were accurate;

f. Whether Sack acted within the scope of his employment or agency;

g. Whether Defendants owed and breached duties to the Classes; and

h. The nature of the injunctive relief, including notice, image identification and recovery, and monitoring, to which the Classes are entitled.

107. Typicality. Plaintiffs' claims arise from the same course of conduct by the same physician and the same institutional failures, and are typical of the claims of the Classes. The representatives of each hospital subclass were treated at a facility of the Hospital Defendant against which that subclass proceeds: (a) John Doe 4, John Doe 5, John Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, John Doe

12, and Jane Doe 13 for the Nationwide Children's Subclass; and (b) John Doe 2, Jane Doe 3, and John Doe 6 for the Mercy St. Vincent Subclass. John Doe 1 and John Doe 12, and their parents, represent the Michigan Subclass.

108. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Classes. They have no interests antagonistic to the Classes and have retained counsel experienced in class actions, child sexual-abuse litigation, and complex tort litigation.

109. Rule 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to the Notice and Remediation Class. They have failed to notify patients, to preserve and audit clinical images, and to identify, recover, and destroy images removed from the clinical setting. Final injunctive and declaratory relief is therefore appropriate for that class as a whole, without regard to whether any individual member was depicted.

110. Rule 23(c)(4). In the alternative, and in addition to any other certification, Plaintiffs seek certification of the following issues for class-wide resolution. Their resolution will materially advance every class member's claim: (a) whether the Hospital Defendants had and enforced policies on chaperones, personal devices, clinical photography, remote system access, and image security; (b) whether those policies and practices breached the duty of reasonable care; (c) what the Hospital Defendants knew or should have known about Sack, and when; (d)

whether Sack was the Hospital Defendants' actual or ostensible agent; and (e) whether the Hospital Defendants' post-arrest statements were false or misleading.

111. Superiority. A class action is superior to other methods of adjudication. Most class members are young children who do not and cannot know whether they were photographed or whether their images were removed; the evidence is concentrated in Defendants' records and in the criminal evidence; separate actions would risk inconsistent adjudications; and a single forum allows uniform protection of class members' confidentiality.

## CHOICE OF LAW

112. Under Michigan's choice-of-law rules, which this Court applies to Plaintiffs' state-law claims, Michigan law governs tort claims unless a rational reason exists to displace it. *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 286 (1997). No such reason exists here. Each state-law count is therefore pleaded under Michigan law. In the alternative, and only to the extent the Court determines that another State's law governs a particular claim or class member, each count is pleaded under the law of Ohio. Counts I and II arise under federal law.

113. Michigan has a substantial interest in applying its law. Sack is a Michigan domiciliary who possessed, stored, and accessed the images at issue in Michigan, and the related prosecution is pending in this District. Crim. Compl., Aff. ¶¶ 8, 19–20. The Hospital Defendants deliberately served the southeast Michigan

market and recruited a Michigan-based physician. Michigan children, including John Doe 1 and John Doe 12, are members of the Classes. Michigan has a strong public policy of protecting children from sexual exploitation. Applying Michigan law uniformly to the Classes also promotes predictability and the efficient, consistent adjudication of common issues.

**COUNT I**

**CIVIL REMEDY FOR PERSONAL INJURIES — 18 U.S.C. § 2255**

*(All Minor Plaintiffs and the Depicted Patient Class against Defendant Sack)*

114. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

115. Section 2255(a) provides a civil remedy to "[a]ny person who, while a minor, was a victim of a violation of section . . . 2251, . . . 2252, 2252A, . . . of this title and who suffers personal injury as a result of such violation." 18 U.S.C. § 2255(a).

116. Upon information and belief, Sack violated 18 U.S.C. § 2251(a) by using Minor Plaintiffs and Depicted Patient Class members to produce visual depictions of the lascivious exhibition of their genitals, using materials that had been transported in interstate commerce, including his cell phone, and transmitting them through interstate commerce, including to his Dropbox account. The depictions were lascivious, not clinical, as shown by their context. Sack captured them on a personal

phone rather than hospital equipment. He removed them from the medical record. He stored them in the same account as 1,291 files of child pornography and in an account structure that concealed LS-series material in hidden folders. And he kept them for his own sexual interest rather than for treatment. Crim. Compl., Aff. ¶¶ 14–18.

117. Upon information and belief, Sack violated 18 U.S.C. § 2252A(a)(2) and (a)(5)(B) by knowingly receiving and possessing, in his Dropbox account and on his devices, visual depictions of Minor Plaintiffs and Depicted Patient Class members that constitute child pornography as defined by 18 U.S.C. § 2256(8).

118. Minor Plaintiffs and Depicted Patient Class members were minors at the time of those violations and have suffered personal injury as a result of them.

119. Each Minor Plaintiff and Depicted Patient Class member is entitled to recover the greater of actual damages or liquidated damages of $150,000, the costs of the action including reasonable attorney's fees and other litigation costs reasonably incurred, punitive damages, and such preliminary and equitable relief as the Court determines appropriate. 18 U.S.C. § 2255(a).

**COUNT II**

**CIVIL REMEDY FOR PERSONS AGGRIEVED — 18 U.S.C. § 2252A(f)**

*(All Minor Plaintiffs and the Depicted Patient Class against Defendant Sack)*

120. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

121. "Any person aggrieved by reason of the conduct prohibited under subsection (a) or (b)" of 18 U.S.C. § 2252A may bring a civil action for injunctive relief, compensatory and punitive damages, and the costs of the action and reasonable attorney and expert fees. 18 U.S.C. § 2252A(f).

122. Sack engaged in conduct prohibited by 18 U.S.C. § 2252A(a), including the receipt and possession of child pornography. Crim. Compl., Aff. ¶¶ 14–18. Upon information and belief, that conduct included the receipt and possession of visual depictions of Minor Plaintiffs and Depicted Patient Class members.

123. Minor Plaintiffs and Depicted Patient Class members are persons aggrieved by that conduct.

124. Minor Plaintiffs and Depicted Patient Class members are entitled to compensatory and punitive damages; fees and costs; and temporary, preliminary, and permanent injunctive relief. That relief would require Sack to identify, preserve for law enforcement and this Court, and then permanently destroy every image of any patient in his possession, custody, or control, and to identify every account, device, and person to which any such image was transmitted.

## COUNT III

## INVASION OF PRIVACY — INTRUSION UPON SECLUSION

*(All Minor Plaintiffs and the Depicted Patient Class against all Defendants)*

125. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

126. Under Michigan law, intrusion upon seclusion requires (1) a secret and private subject matter, (2) a right to keep that subject matter private, and (3) the obtaining of information about it through a method objectionable to a reasonable person. A child's unclothed body and genitals during pediatric urological examinations, imaging, procedures, and surgeries is the most private of subject matters. Minor Plaintiffs and class members had the right to keep it private except as legitimately required for their treatment, and to have any image remain in the medical record.

127. Sack intentionally intruded upon that seclusion and obtained images of their bodies through a method objectionable to any reasonable person. He viewed, photographed, recorded, removed, and stored those images for purposes other than legitimate treatment, including on a personal phone and in personal cloud accounts, and kept them in an account alongside child pornography.

128. The intrusion is highly offensive to a reasonable person.

129. Sack committed the intrusion while performing the very examinations, imaging, and procedures that the Hospital Defendants employed and authorized him to perform, on their premises, with their equipment and networks, and with the access they gave him. The Hospital Defendants are liable for it as Sack's employer and principal. In the alternative, they are liable under the doctrine of ostensible agency. They held Sack out as their physician and their Chief of Pediatric Urology, and Plaintiffs looked to the hospitals, not to Sack individually, for their children's care. Plaintiffs had no notice that Sack was anything other than the hospitals' own physician. The Hospital Defendants' direct liability under Counts V through VII does not depend on their vicarious liability for Sack's conduct.

130. As a direct and proximate result, Plaintiffs and class members have suffered the injuries and damages alleged above.

**COUNT IV**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

*(Minor Plaintiffs and Parent Plaintiffs, individually and not on behalf of any class, against Defendant Sack)*

131. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

132. Sack's conduct — exploiting a physician's access to undressed and anesthetized children to photograph and record their genitals, removing those images to personal accounts, and keeping them alongside thousands of images of child

pornography and child-exploitative material — is extreme and outrageous, beyond all bounds of decency, and utterly intolerable in a civilized community.

133. Sack acted intentionally or recklessly, knowing that severe emotional distress to his patients and their parents was substantially certain to result, and with actual malice. Plaintiffs are therefore entitled to exemplary damages under Michigan law for the humiliation, outrage, and indignity Sack's conduct caused, and, to the extent another State's law applies, to punitive damages.

134. Plaintiffs have suffered severe emotional distress as a result, including fear, anxiety, depression, humiliation, distrust of medical providers and avoidance of medical care, and disruption of family relationships.

135. As a direct and proximate result, Plaintiffs have suffered the injuries and damages alleged above.

**COUNT V**

**NEGLIGENCE**

*(All Plaintiffs, the Nationwide Children's Subclass, the Mercy St. Vincent Subclass, and the Parent Class against the Hospital Defendants, each as to the subclass it served, and against Doe Corporations 1–10 and John Roes 1–10)*

136. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

137. The Hospital Defendants stood in a special relationship with their minor patients. Those patients, many of them infants and many sedated or under general

anesthesia, were entrusted to the Hospital Defendants' custody and control and were wholly unable to protect themselves. That special relationship gave rise to a duty to use reasonable care to protect them from foreseeable harm while in the hospitals' care, including harm to their privacy, dignity, and safety at the hands of the hospitals' own physicians and others the hospitals permitted to access them.

138. The Hospital Defendants breached that duty, including by:

(a) Failing to require and enforce the presence of a chaperone during Sack's examinations, imaging, and other encounters with undressed children;

(b) Permitting Sack to separate children from their parents without a chaperone;

(c) Permitting Sack to use a personal cell phone in examination and procedure rooms and to photograph children's genitals with it;

(d) Failing to provide and require secure, hospital-controlled equipment for clinical photography;

(e) Failing to enforce their prohibition on keeping clinical images on personal devices and cloud accounts;

(f) Failing to monitor their networks and imaging systems for the removal of clinical images and for access to cloud accounts used to store child pornography;

(g) Failing to train staff to recognize and report boundary violations and grooming behavior by physicians;

(h) Failing to investigate and act on complaints and observations about Sack;

(i) Granting Sack remote access to clinical systems and images from his Michigan residence without controls to prevent the export of

patient images. As to Mercy St. Vincent, failing to control the pediatric urology clinic, campus, and network it operated, including the network from which Sack's Dropbox account was accessed; and

(j) Otherwise failing to act as a reasonably careful hospital would under the circumstances.

139. Clinical photographs and video of a patient's body, and the diagnoses and procedures they depict, are confidential medical information that a physician and hospital may not disclose without the patient's or guardian's authorization. Michigan law recognizes a patient's right to confidential treatment of personal and medical records, Mich. Comp. Laws § 333.20201(2)(c), and the confidential nature of information acquired in the physician-patient relationship, Mich. Comp. Laws § 600.2157. To the extent Ohio law applies, it recognizes an independent tort for the unauthorized, unprivileged disclosure of nonpublic medical information. *Biddle v. Warren Gen. Hosp.*, 86 Ohio St. 3d 395, 399 (1999).

140. Sack, without authorization or privilege, removed clinical images of children from the Hospital Defendants' records and disclosed them to third parties. He uploaded them to commercial cloud-storage providers outside the hospitals' control, whose personnel and systems reviewed the account's contents and reported them. Upon information and belief, he also disclosed them to other persons. Crim. Compl., Aff. ¶¶ 6–7, 12.

141. The Hospital Defendants had a duty to safeguard that information and are liable for the disclosure because Sack acted as their employee and agent, and because they failed to implement and enforce reasonable controls over the capture, storage, and transmission of clinical images, including, upon information and belief, controls that their own policies and Sack's employment terms required.

142. These failures do not involve the diagnosis or treatment of any Plaintiff's medical condition or any question of medical judgment beyond the realm of common knowledge and experience. Their unreasonableness is within the common knowledge and experience of lay jurors. Plaintiffs' claims therefore sound in ordinary negligence, not medical malpractice. *See Bryant v. Oakpointe Villa Nursing Ctr., Inc.*, 471 Mich. 411, 430-31 (2004) (explaining no expert testimony necessary to determine the defendant's negligence). The notice, affidavit-of-merit, limitations, and damages-limitation provisions governing medical malpractice actions do not apply.

143. As a direct and proximate result, Plaintiffs and class members have suffered the injuries and damages alleged above.

## COUNT VI

## NEGLIGENT SUPERVISION

*(All Plaintiffs, the Nationwide Children's Subclass, the Mercy St. Vincent Subclass, and the Parent Class against the Hospital Defendants, each as to the subclass it served, and against Doe Corporations 1–10 and John Roes 1–10)*

144. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

145. Nationwide Children's employed, credentialed, and controlled Sack. Mercy St. Vincent, upon information and belief, credentialed Sack or granted him privileges, and controlled the clinic, campus, staff, and network through which he saw patients. Each had a duty to supervise Sack in his encounters with children on its premises and through its systems. Under Michigan law, an employer or principal is liable for negligent supervision and retention when it knew or should have known of the agent's propensity to commit the misconduct at issue, even where that misconduct falls outside the scope of employment.

146. The Hospital Defendants knew or should have known of Sack's propensity to engage in the conduct alleged in this Complaint, including through his use of personal devices, his separation of children from their parents, his boundary-crossing conduct, his access to his Dropbox account from a hospital-campus network, and, upon information and belief, complaints from patients, families, and staff.

147. The Hospital Defendants failed to supervise Sack, failed to restrict his unsupervised access to children, and failed to investigate or act on warning signs.

148. As a direct and proximate result, Plaintiffs and class members have suffered the injuries and damages alleged above.

## COUNT VII

## NEGLIGENT HIRING, CREDENTIALING, AND RETENTION

*(All Plaintiffs, the Nationwide Children's Subclass, the Mercy St. Vincent Subclass, and the Parent Class against the Hospital Defendants, each as to the subclass it served, and against Doe Corporations 1–10 and John Roes 1–10)*

149. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

150. The Hospital Defendants had a duty to use reasonable care in hiring, credentialing, granting privileges to, and retaining physicians with access to vulnerable children, including through ongoing peer review and investigation of complaints.

151. The Hospital Defendants knew or, through reasonable diligence in hiring, credentialing, peer review, and monitoring, should have known that Sack posed a risk to children, and they hired, credentialed, and retained him nonetheless, and placed him in charge of pediatric urology.

152. As a direct and proximate result, Plaintiffs and class members have suffered the injuries and damages alleged above.

## COUNT VIII

## FRAUDULENT CONCEALMENT, SILENT FRAUD, AND NEGLIGENT PERFORMANCE OF AN ASSUMED DUTY

*(All Plaintiffs, the Nationwide Children's Subclass, and the Parent Class against Defendant Nationwide Children's)*

153. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

154. Nationwide Children's learned no later than February 2026 that its Chief of Pediatric Urology had been arrested for child-pornography offenses. Upon information and belief, it also knew that the terms of his employment prohibited keeping clinical images on personal devices or cloud accounts. Having that knowledge, it chose to speak to the public and to its patients' families about whether those charges related to his clinical work. By speaking, it assumed a duty to speak truthfully and completely, and it voluntarily undertook to inform families whether their children had been affected. Its superior knowledge, and its relationship with its patients, also imposed a duty to disclose what it knew.

155. Nationwide Children's instead stated publicly that its "understanding from law enforcement is that the charges are not related to his clinical work including Nationwide Children's – Toledo." However, in or about March 2026, a Nationwide Children's representative telephoned John Doe 4's mother and told her that no patients had been affected. Nationwide Children's made these statements without a reasonable basis and while suppressing what it knew about Sack's prohibited retention of clinical images. Upon information and belief, it intended that patients and families rely on them and refrain from inquiry.

156. Plaintiffs reasonably relied on those statements and that silence. As a result, they delayed the counseling, evaluation, records requests, and legal action they would otherwise have pursued, and they suffered additional distress when the truth was disclosed in the federal criminal complaint. The same concealment extends the limitations period under Mich. Comp. Laws § 600.5855.

157. As a direct and proximate result, Plaintiffs and class members have suffered the injuries and damages alleged above.

## COUNT IX

## PARENTAL CLAIMS — MEDICAL EXPENSES AND LOSS OF SERVICES

*(Parent Plaintiffs and the Parent Class against all Defendants)*

158. Plaintiffs incorporate each preceding paragraph as if fully set forth herein.

159. As a direct and proximate result of Defendants' conduct, Parent Plaintiffs and Parent Class members have incurred and will incur expenses for the medical, psychological, and counseling care of their children, and have suffered and will suffer the loss of their children's services. To the extent Ohio law applies, they have also suffered the loss of their children's society, companionship, and comfort.

160. Parent Plaintiffs and Parent Class members are entitled to recover those damages from Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request that the Court enter judgment in their favor and against Defendants, jointly and severally where permitted by law, and award the following relief:

a) Certification of the Classes and subclasses under Fed. R. Civ. P. 23(b)(2) and (b)(3), and of the issues identified above under Rule 23(c)(4); appointment of Plaintiffs as class representatives; and appointment of their counsel as class counsel;

b) Leave for Plaintiffs to proceed under pseudonyms and a protective order preserving the confidentiality of all Minor Plaintiffs and class members;

c) Against Sack, for each Minor Plaintiff and Depicted Patient Class member, the greater of actual damages or liquidated damages of $150,000 under 18 U.S.C. § 2255(a);

d) Compensatory damages, in an amount to be determined at trial, in excess of $75,000 for each Plaintiff and in excess of $5,000,000 in the aggregate;

e) Punitive damages against Sack under 18 U.S.C. §§ 2255(a) and 2252A(f); exemplary damages under Michigan law; and, to the extent another State's law applies, punitive damages against any Defendant as that law permits;

f) Preliminary and permanent injunctive relief requiring Sack to identify, preserve for law enforcement and this Court, and then permanently destroy every image of any patient in his possession, custody, or control, and to identify every account, device, and recipient to which any such image was transmitted. That relief includes an order, coordinated with the United States and the forfeiture proceedings under 18 U.S.C. § 2253, ensuring that no forfeited device, account, or visual depiction is destroyed before patient images on it have been identified for victim notification, under appropriate protective conditions;

g) Preliminary and permanent injunctive relief requiring the Hospital Defendants to: (1) preserve all images and records of every patient Sack treated; (2) identify and give written notice to each such patient and family; (3) audit their systems to determine what clinical images Sack accessed, exported, or transmitted; (4) conduct an independent audit of their clinical-imaging, personal-device, remote-access, chaperone, and network-security practices; (5) cooperate in identifying patients depicted in recovered images; and (6) fund counseling for affected patients and families;

h) Reasonable attorney's fees, expert fees, and costs, including under 18 U.S.C. §§ 2255(a) and 2252A(f)(2)(C);

i) Pre-judgment and post-judgment interest as permitted by law; and

j) Such other relief as the Court deems just and proper.

Dated: November 4, 2026

Respectfully submitted,

STINAR LANNEN, PLLC

/s/ *Patrick Lannen*
Parker Stinar (P75252)
Patrick Lannen (P73031)
280 W. Maple Rd., Ste. 200
Birmingham, MI 48009
Patrick@StinarLannenLaw.com
Parker@StinarLannenLaw.com

FLOOD LAW, PLLC

/s/ *Michael D. Weaver*
Todd F. Flood (P58555)
Michael D. Weaver (P43985)
155 W. Congress St., Ste. 350
Detroit, MI 48226
tflood@floodlaw.com
mweaver@floodlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

## JURY DEMAND

Plaintiffs, individually and on behalf of the Classes, demand a trial by jury on all issues so triable.

Dated: November 4, 2026

Respectfully submitted,

STINAR LANNEN, PLLC

/s/ *Patrick Lannen*
Parker Stinar (P75252)
Patrick Lannen (P73031)
280 W. Maple Rd., Ste. 200
Birmingham, MI 48009
Patrick@StinarLannenLaw.com
Parker@StinarLannenLaw.com

FLOOD LAW, PLLC

/s/ *Michael D. Weaver*
Todd F. Flood (P58555)
Michael D. Weaver (P43985)
155 W. Congress St., Ste. 350
Detroit, MI 48226
tflood@floodlaw.com
mweaver@floodlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*